1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANGELO MATTHEW GARCIA,

11             Petitioner,              No. CIV S-02-0891 DFL DAD P

12        vs.

13   C. K. PLILER, et al.,

14             Respondents.          FINDINGS & RECOMMENDATIONS

15   _____/

16           Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1997 conviction on

18   charges of second degree murder and robbery.  In his first amended petition petitioner seeks relief

19   on the grounds that the police failed to obtain from him a valid waiver of his Miranda rights and

20   that his confession was involuntary and coerced, in violation of the Fifth, Sixth and Fourteenth

21   Amendments to the United States Constitution.  Upon careful consideration of the record and the

22   applicable law, the undersigned will recommend that petitioner's application for habeas corpus

23   relief be denied.

24                   PROCEDURAL BACKGROUND

25           On September 3, 1996, a complaint was filed in the Sacramento Superior and

26   Municipal Court charging petitioner with felony murder by use of a firearm, in violation of Cal.

1

1   Penal Code §§ 187 and 12022.5(a).  (Clerk's Transcript on Appeal (CT) at 9-10.)  On that same

2   day, petitioner was arraigned and pled not guilty.  (Id. at 1.)  On July 23, 1997, an amended

3   information was filed charging petitioner with: (1) murder by use of a firearm, in violation of

4   Cal. Penal Code §§ 187(a) and 12022.5(a), with a special circumstance allegation that the murder

5   was committed while petitioner was engaged in the commission or attempted commission of the

6   crime of robbery, within the meaning of Cal. Penal Code § 190.2(a)(17) (count one); and (2)

7   robbery by use of a firearm, in violation of Cal. Penal Code §§ 211 and 12022.5(a) (count two).

8   (Id. at 65-68.)  The information also alleged that petitioner had suffered a prior conviction within

9   the meaning of California's Three Strikes Law.  (Id. at 67.)

10           On July 23, 1997, petitioner filed a motion to suppress his statements made to the

11   police.  (Id. at 68.1.) That motion was denied on July 24, 1997, prior to the start of trial.

12   (Reporter's Transcript on Appeal (RT) at 15-18.)  After a jury trial, petitioner was convicted of

13   one count of second degree murder with personal use of a firearm and one count of robbery with

14   personal use of a firearm.  (Id. at 275-78.)  On September 26, 1997, the trial court found true the

15   prior "strike" conviction allegation and sentenced petitioner to an aggregate prison term of 39

16   years-to-life in state prison.  (RT at 497-98; CT at 8.)

17           Petitioner filed a timely notice of appeal.  (CT at 313.)  In an unpublished decision

18   dated March 15, 2000, petitioner's conviction was affirmed by the California Court of Appeal for

19   the Third Appellate District but his sentence was modified to 34 years-to-life in state prison.

20   (Answer, Ex. E.)  On April 28, 2000, petitioner filed a petition for review in the California

21   Supreme Court.  (Answer, Ex. F.)  That petition was summarily denied by order dated July 12,

22   2000.  (Id.)

23           On May 31, 2000, petitioner filed a petition for writ of habeas corpus in the

24   California Superior Court in which he challenged the portion of his sentence that was based on

25   the true finding of the prior "strike" conviction allegation. (Answer, Exs. G, H.)  By order dated

26   December 18, 2000, the petition was granted, imposition of sentence pursuant to the Three

1   Strikes Law was stricken, and petitioner's sentence on the murder count was modified to an

2   indeterminate term of 15 years plus an additional consecutive determinate term of 4 years.

3   (Answer, Ex. H.)

4            On November 30, 2001, petitioner filed a petition for writ of habeas corpus in the

5   California Supreme Court.  (Answer, Ex. I.)  That petition was summarily denied by order dated

6   March 20, 2002.  (Id.)

7                              FACTUAL BACKGROUND[1]

8            On August 29, 1996, defendant participated in a plan to rob 17-
         year old Eric Hesterlee, a small-time marijuana dealer.
9        Defendant's friend and codefendant, Christopher Deragon,
         arranged for the victim to go to a schoolyard on the pretext of
10       making a marijuana sale.[2]  Defendant went to the schoolyard in his
         car with his friend, Randy Bettencourt, acting as driver.
11       Bettencourt stayed in the car with the engine running while
         defendant went into the schoolyard.
12
         When he came upon the victim and Deragon, defendant pulled out
13       a pistol and demanded that the victim give up his marijuana and
         money.  When the victim refused and attempted to resist, defendant
14       fired three shots, two of which struck and killed the victim.  The
         absence of powder residue on the victim's clothing and body
15       indicated the shots were fired from a distance of at least 24 inches.

16       During the encounter, some of the victim's marijuana spilled onto
         the ground.  Defendant took the remaining marijuana and fled to
17       his car.  Soon after the shooting, officers stopped the car a short
         distance from the crime.  On his person, defendant had the
18       marijuana and a roll of money filled with newspaper to make it
         look bigger.  The murder weapon was on the floorboard of the car
19       where defendant had been seated.

20   /////

21   /////

22   /////

23  _____
        [1]  The following summary is drawn from the March 15, 2000, opinion by the California
24  Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 2-3, filed on June
    11, 2003, as Exhibit E to Respondents' answer.
25
        [2]  Deragon and defendant had joint trials before separate juries.  Deragon was convicted
26  of first degree murder and robbery.  His appeal is pending (case no. C028318).

ANALYSIS

I.  Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)).  See also Lisenba v. California, 314 U.S. 219, 236 (1941); Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).  In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962).  See also Henry, 197 F.3d at 1031; Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968).  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) as amended by the AEDPA, sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

1          (1) resulted in a decision that was contrary to, or involved
2   an unreasonable application of, clearly established Federal law, as
    determined by the Supreme Court of the United States; or

3          (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the
4   State court proceeding.

5   28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

6   Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

7   II.  Petitioner's Claims

8        A.  Failure to Obtain a Valid Miranda Waiver

9          Petitioner's first claim is that his Fifth and Sixth Amendment rights were violated

10  when the police failed to obtain from him a valid waiver of his constitutional (Miranda) rights

11  prior to his interrogation.  Petitioner's argument in this regard was rejected by the California

12  Court of Appeal in a written decision on petitioner's direct appeal, and without comment by the

13  California Supreme Court in denying the petition for review.  (See Answer, Exs. E, F.)  The

14  California Court of Appeal explained the background to the claim and its reasoning in rejecting it

15  as follows:

16        Defendant made a motion to exclude his extrajudicial statements,
          arguing they were obtained in violation of Miranda v. Arizona,
17        (1966) 384 U.S. 436 [16 L.Ed.2d 694].  The statements were made
          during an interview conducted on the night of the murder.  The
18        interview was commenced by Detective Minter, who did not
          appear to have much information concerning the killing.  A
19        transcript of the interview disclosed the following:

20        To begin the interview, Detective Minter introduced herself and
          said she was there to talk "about what happened."  Defendant
21        replied: "That's what I need to know.  (Unintelligible) the police,
          but they wouldn't tell me."  After inquiring and being told that
22        defendant had been arrested before, Minter said: "Okay.  What I'll
          do, then, um, before we can talk about what happened, before even
23        I can tell you what happened, I'm gonna advise you of your rights;
          that way you know what your rights are.  Um, what time is it?  It's
24        11:19. [¶] Um, you have the right to remain silent.  Anything you
          say can be used in court.  You have the right to talk to an attorney
25        and to have an attorney present.  Um, if you can't afford one, one
          will be appointed, free of charge, to represent you.  And you've
26        heard those – those before?"  Defendant answered "Yeah."

5

Minter then continued: "Okay. Um, basically, um, an incident happened, um, and evidently a car, either similar to yours or your car, I don't know, but your car was picked out, the car you were in." After asking whether defendant had been "involved in any kind of altercation," and being told no, Minter began asking defendant about his whereabouts during the evening. Eventually Detectives Fancher and Garverick took over the questioning, and the interview became more accusatory and confrontational.

Based on the totality of the circumstances, the trial court found defendant knowingly and voluntarily waived his rights and talked to the police. We agree.

* * *

The record reflects that defendant is an intelligent and street-wise young man who has been through the legal system before. He wanted information as much as did the detectives. The interview was a game of cat-and-mouse in which defendant attempted to learn what the detectives knew and what his companions were saying. As defendant learned what the officers knew, he modified his own story to answer things that he could not convincingly deny while minimizing his own role.

It is true that, after advising defendant of his rights, Detective Minter did not obtain an express waiver. However, an express waiver is not required where a suspect's actions make it clear that a waiver was intended. (People v. Whitson, supra, 17 Cal.4th at p. 250.) On this record we are satisfied that defendant desired to waive his rights and talk to the police.

(Opinion at 3-5.)

    1. Legal Standards

        Any waiver of the Fifth Amendment right to remain silent must be voluntary as well as knowing and intelligent. Colorado v. Spring, 479 U.S. 564, 572 (1987); Moran v. Burbine, 475 U.S. 412, 421 (1986). The waiver must be both "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and knowing in that it "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Spring, 479 U.S. at 573. Only if the "'totality of the circumstances surrounding the interrogation'" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that

1 the Miranda rights have been waived." Moran, 475 U.S. at 421.  See also Juan H. v. Allen, 408

2 F.3d 1262, 1271 (9th Cir. 2005).

3       A waiver of one's rights under Miranda "need not be express."  United States v.

4 Younger, 398 F.3d 1179, 1185 (9th Cir. 2005).  However, there is a "presumption against

5 waiver."  Id.  In soliciting a waiver of Miranda rights, "police officers need not use a waiver form

6 nor ask explicitly whether a defendant intends to waive his or her rights."  Id.; United States v.

7 Cazares, 121 F.3d 1241, 1244 (9th Cir.1997).  Waiver can be inferred "from the actions and

8 words of the person interrogated."  North Carolina v. Butler, 441 U.S. 369, 373 (1979).

9 However, "[i]f the interrogation continues without the presence of an attorney and a statement is

10 taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and

11 intelligently waived his privilege against self-incrimination and his right to retained or appointed

12 counsel."  Miranda, 384 U.S. at 475.

13       2.  Application of AEDPA

14       Petitioner argues that this court must decide his Miranda claim "de novo" because

15 the decision of the California Court of Appeal with respect to the claim was contrary to or an

16 unreasonable application of federal law.  (Traverse at 52, 57.)  See Cooperwood v. Cambra, 245

17 F.3d 1042, 1046 (9th Cir. 2001) ("when a state court employs the wrong legal standard, the

18 AEDPA rule of deference does not apply").  Petitioner first argues that the state appellate court

19 erred in its determination of the appropriate burden of proof born by the prosecution in

20 demonstrating a waiver of constitutional (Miranda) rights.  He contends that the state appellate

21 court applied a lower burden than federal law requires and improperly relied on the analysis of

22 the state trial court.

23       In denying petitioner's pretrial motion to suppress his statements to police, the

24 state trial court stated as follows:

25            The Court has, first of all, reviewed the tape-recording confession
           in its entirety.

26

The Court, furthermore, has addressed itself to several cases with respect to this area starting with Butler against North Carolina and several subsequent cases.

Suffice it to say, the general rule is simply whether or not the People have carried a preponderance of the evidence burden to establish that the defendant understood his rights in this matter.

The record in that regard is slim, to be sure, in that instead of inquiring whether or not the defendant understood his rights, the sole question to him was whether or not he had heard them before.

The answer to that was in the affirmative.  Beyond that there was nothing.

Obviously the judicial branch of government will guard against reducing Miranda warnings to a perfunctory and meaningless exercise, because the exclusionary rule for all its deficits is still designed to do that which the police were unwilling to voluntarily do, to wit, comport themselves with the requirements of the Constitution for which our forefathers died.

Now the Court is distressed to see that such a limited circumstance as this is presented to it.  However, we have several circumstances.

One, evidence has been adduced by the People that, in fact, the defendant had indeed officially heard them before.

And Court [sic] will admit into evidence a previous Miranda warning form which he signed on September the 24th, 1994. And I'm satisfied that the document is admissible under the public record exception to the hearsay rule.

And I'm satisfied that the signature shown on that is the same at [sic] the signature shown on his license ID.

Furthermore, I probably would, even without that evidence, be satisfied that indeed the defendant had heard of the rights before because it's hard to think of any American over the age of 15 who hasn't heard them before, either on television or any other way.

The question more precisely is whether or not having heard them before is an admission that he understood them.

I think then the Court has to look to the totality of the circumstances in the record.

And looking at the record here we find a defendant who is clearly able to communicate without any difficulty at all and able to understand.

> And there's no hint of the want of understanding at any time during the course of this interview.
>
> Furthermore, there's the absolute want on any coerciveness to it. However, that's not particularly the standard here.
>
> The want of coerciveness alone would not be determinative if there was no evidence of the understanding of the rights.
>
> However, coupled with the fact of the admission that he had heard of the rights before, coupled with the fact that we know precisely that he did hear and did previously understand those rights, at least as early as September of 1994, I'm satisfied that the slim burden of proof in this case has been met, and I will deny the motion to exclude the testimony.

(RT at 15-18.)

In reviewing the trial court's ruling on this issue the California Court of Appeal described the prosecutor's burden of proof in establishing a waiver of constitutional rights as follows:

> The prosecution has the burden to prove by a preponderance of the evidence that the defendant waived his right to remain silent. (People v. Whitson (1998) 17 Cal.4th 229, 248.)  On appeal, we view the evidence in a light most favorable to the trial court's decision and independently determine whether, from the undisputed facts and facts found by the trial court, the challenged statements were obtained illegally.  (Ibid.)  While we exercise independent judgment in resolving the legal question, we give great weight to the considered conclusion of the trial court.  (Ibid.)

(Opinion at 4.)  As previously noted, the state trial court described the state's burden of proof on the issue of waiver as "slim."  (RT at 18.)

As discussed above, the government bears a "heavy" burden to show a waiver of constitutional rights.  Miranda, 384 U.S. at 475.  However, "[w]henever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our Miranda doctrine, the State need prove waiver only by a preponderance of the evidence."  Colorado v. Connelly, 479 U.S. 157, 168 (1986).  The decision of the California Court of Appeal with respect to the appropriate burden of proof is consistent with this federal standard.  The state appellate court properly noted that the prosecution bore the burden of proof and correctly defined

9

1  the burden as a "preponderance of the evidence."  The state appellate court also twice referred to

2  its duty to exercise "independent" judgment in deciding the legal question of waiver.  This court

3  finds no error in the state appellate court's analysis of the legal standard to employ in determining

4  whether petitioner validly waived his constitutional rights.

5          Petitioner also argues that the state appellate court failed to consider the totality of

6  the circumstances in reaching its decision regarding waiver and gave too much weight to

7  petitioner's "purported savvy and capacity to understand the Miranda warning."  (Traverse at 54.)

8  Petitioner provides a list of factors he believes the state appellate court failed to consider in its

9  consideration of the waiver issue.  (Id. at 54-55.)  However, the state court also specifically stated

10  that it reviewed "the record" and "the totality of the circumstances" in finding that petitioner

11  voluntarily waived his constitutional rights.  (Opinion at 4.)  The court also discussed those

12  portions of the record that supported its conclusion on this issue.  (Id. at 4-5.)  This court

13  concludes that the California Court of Appeal adequately considered the relevant circumstances in

14  concluding that petitioner waived his Miranda rights.

15          Petitioner has failed to show that the state court employed the wrong legal

16  standards in analyzing his claim that police did not obtain from him a valid waiver of his right to

17  remain silent.  Accordingly, this court will analyze petitioner's claim pursuant to the ADEPA.

18          3.  Waiver

19          Petitioner argues that he did not make a valid waiver of his constitutional rights.

20  First, he notes that he was not specifically asked whether he understood his rights.  Instead, he was

21  only asked whether he had heard them before.  (Traverse at 47.)  Petitioner contends that his

22  affirmative response to the officer's question was not sufficient to constitute a waiver, arguing

23  that "inquiring as to whether the defendant has heard [his rights] before borders on the irrelevant."

24  (Id. at 48.)  See Miranda, 384 U.S. at 475 (the court may not presume waiver from a "silent

25  record").  Petitioner also argues that Officer Minter used psychological "bait and switch" tactics to

26  trick him into waiving his constitutional rights.  See id. at 476 ("any evidence that the accused

10

1   was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not

2   voluntarily waive his privileges").

3           The state appellate court concluded, after a review of the entire interrogation, that

4   petitioner desired to talk with the police and therefore waived his rights to remain silent and to the

5   assistance of counsel.  This court has also reviewed the relevant portions of petitioner's

6   confession and concludes that the state appellate court's decision in this regard is not contrary to

7   the federal standards set forth above.  There is no evidence in the record of police overreaching in

8   obtaining his interview.  This court does not view Officer Minter's initial questions as an attempt

9   to "trick" petitioner or to coerce him in any way.  Petitioner gave the interrogating officer no

10  indication that he desired to remain silent and there is nothing in the record indicating that

11  petitioner wished to invoke any of his constitutional rights or that he was unclear about what those

12  rights were.  This court is unpersuaded by the argument that petitioner's waiver is invalid because

13  Officer Minter failed to ask him whether he "understood" his rights, instead asking him whether

14  he had "heard" them.  The clear thrust of the officer's question was whether petitioner understood

15  what his rights were, having heard them before.  His answer ("yeah") confirmed that petitioner did

16  understand his rights.

17          Moreover, as petitioner himself concedes, he demonstrated an understanding of his

18  constitutional rights and the wherewithal to assert them when he invoked his "right to remain

19  silent and to an attorney" two months prior to the interrogation at issue here.  (Am. Pet. at 9.)  In

20  light of petitioner's background, experience, and conduct, the court concludes that he made a valid

21  implied waiver of his Miranda rights.  See Terronova v. Kincheloe, 912 F.2d 1176, 1180 (9th Cir.

22  1990) (defendant made a valid implied waiver of his Miranda rights where: (1) he gave the

23  detectives no indication that he wished to remain silent, instead offering an alibi to explain his

24  whereabouts on the evening in question, indicating a willingness to talk; and (2) he demonstrated

25  an ability to assert his rights when he objected to the search of his apartment and when he

26  requested an attorney after making an incriminating statement).

1    The decision of the California Court of Appeal to the same effect is not contrary to

2 federal law and should not be set aside.  See Fare v. Michael C., 442 U.S. 707, 725-26 (1979)

3 ("the determination whether statements obtained during custodial interrogation are admissible

4 against the accused is to be made upon an inquiry into the totality of the circumstances

5 surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily

6 decided to forgo his rights to remain silent and to have the assistance of counsel").[3]

7    4.  The Miranda Warning Itself

8    More troubling, however, is petitioner's suggestion that he is entitled to habeas

9 relief due to solely the insufficiency of the Miranda advisement given by the interrogating

10 officers.   Petitioner presents this issue for the first time in his Traverse.  (Traverse at 42-45.)  Of

11 course, he cannot do so because a "[t]raverse is not the proper pleading to raise additional grounds

12 for relief."  Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).

13    Moreover, petitioner never presented to the California Supreme Court a claim that

14 his statement to the authorities should have been suppressed because the Miranda warning he

15 received from Detective Minter was defective.  (See Answer, Ex. F at 27-29, Ex. I at 5.)  Instead,

16 petitioner presented to the highest state court only the arguments that: (1) the interrogating officers

17 did not obtain from him a valid waiver his right to remain silent in that they did not ask him if he

18 waived this right and (2) the interrogating officers coerced his subsequent confession. (Id.)

19 Indeed in making these arguments to the California Supreme Court petitioner represented that

20 Detective Minter had in fact read him his Miranda rights without suggesting that the advisement

21 was deficient.[4]  (Id.)  Under these circumstances, it would appear that petitioner has failed to

22

23    [3] This court need not undertake a harmless-error inquiry here because the court concludes
24 that the state court was not objectively unreasonable in determining that petitioner validly waived
his right to remain silent.

25    [4] In his first amended petition before this court petitioner again presented his claim as
26 one that his constitutional rights were "violated by the failure of police to obtain a valid waiver of
his Miranda rights prior to interrogation."  (First Am. Pet. at 5 and 8.)

1  exhaust any claim that Detective Minter failed to properly advise him of his <u>Miranda</u> rights

2  thereby entitling him to federal habeas relief.

3          In this regard, a petitioner satisfies the exhaustion requirement by fairly presenting

4  to the highest state court all federal claims before presenting them to the federal court.  <u>See</u>

5  <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995); <u>Picard v. Connor</u>, 404 U.S. 270, 276 (1971); <u>Crotts</u>

6  <u>v. Smith</u>, 73 F.3d 861, 865 (9th Cir. 1996); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1086 (9th Cir.

7  1986).  A federal claim is fairly presented if the petitioner has described the operative facts and

8  legal theory upon which his claim is based.  <u>See Bland v. California Dep't of Corrections</u>, 20 F.3d

9  1469, 1473 (9th Cir. 1994).  "[I]t is not enough . . . that a somewhat similar state-law claim was

10 made." <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982).  As a rule, the "mere similarity of claims is

11 insufficient to exhaust."  <u>Duncan v. Henry</u>, 513 U.S. at 365-66.

12         Finally, even if petitioner's argument that the <u>Miranda</u> warning given by Detective

13 Minter was deficient is properly before this court, for the reasons set forth below petitioner is not

14 entitled to habeas relief.

15         In <u>Miranda v. Arizona</u>, the Supreme Court established the widely recognized rule

16 that, during a custodial interrogation, an accused:

17             ... must be warned prior to any questioning that he has the right to
              remain silent, that anything he says can be used against him in a
18            court of law, that he has the right to the presence of an attorney, and
              that if he cannot afford an attorney one will be appointed for him
19            prior to any questioning if he so desires.

20 384 U.S. 436, 478-79 (1966).  The admissibility of any statement given during a custodial

21 interrogation of a suspect depends on whether the police provided the suspect with these four

22 warnings. <u>Id.</u> at 479; <u>United States v. Perez-Lopez</u>, 348 F.3d 839, 848 (9th Cir. 2003).  "The

23 warning must be clear and not susceptible to equivocation." <u>United States v. San Juan-Cruz</u>, 314

24 F.3d 384, 387 (9th Cir. 2002).  <u>See also</u> <u>Perez-Lopez</u>, 348 F.3d at 848.  The requirements of

25 <u>Miranda</u> are "clearly established" federal law within the meaning of AEDPA.  28 U.S.C. §

26 2254(d); <u>Dickerson v. United States</u>, 530 U.S. 428, 443 (2000) ("<u>Miranda</u> has become embedded

1   in routine police practice to the point where the warnings have become part of our national

2   culture").

3            Subsequent to its decision in <u>Miranda</u> the Supreme Court made clear that it "never

4   indicated that the 'rigidity' of <u>Miranda</u> extends to the precise formulation of the warnings given"

5   and that "[q]uite the contrary, <u>Miranda</u> itself indicates that no talismanic incantation was required

6   to satisfy its strictures."  <u>California v. Prysock</u>, 453 U.S. 355, 359 (1981)   What is required is not

7   "a verbatim recital of the words of the <u>Miranda</u> opinion but rather" words which in substance have

8   "fully conveyed to [defendant] his rights as required by <u>Miranda</u>."  453 U.S. at 360-61.

9   Consistent with these principles the decision in <u>Miranda</u> has been found to require "meaningful

10  advice to the unlettered and unlearned in language which he can comprehend and on which he can

11  knowingly act."  453 U.S. at 364 n.3 (Stevens, J., dissenting) (quoting <u>Coyote v. United States</u>,

12  380 F.2d 305, 308 (10th Cir. 1967).  <u>See</u> <u>also</u> <u>Perez-Lopez</u>, 348 F.3d at 848; <u>San Juan-Cruz</u>, 314

13  F.3d at 387; <u>United States v. Connell</u>, 869 F.2d 1349, 1351 (9th Cir. 1989).

14           Petitioner argues that the warnings given by Detective Minter were not a "fully

15  effective equivalent of the standard <u>Miranda</u> advisement."  (Traverse at 42.)  He contends that the

16  words used to apprise him of his constitutional rights were constitutionally insufficient to give

17  him "a full awareness of both the nature of the right being abandoned and the consequences of the

18  decision to abandon it."  (<u>Id.</u> at 42.)   In this vein, petitioner first complains that while he was

19  informed that "anything you say can be used in court," he was not informed that anything he said

20  could be used "against" him in court.  (<u>Id.</u> at 43.)  Petitioner argues that this portion of the

21  <u>Miranda</u> advisement is the "most critical part because it lies at the heart of the need to protect a

22  citizen's Fifth Amendment rights."  (<u>Id.</u>)  He contends that a specific warning that a suspect's

23  words can be used "against" him is required in order to apprise him of the consequences of a

24  waiver of his right to remain silent.  The court disagrees.

25           Officer Minter's warning to petitioner that "anything you say can be used in court"

26  reasonably conveyed to petitioner the fact that his statements could be used "against" him.  Any

1   other interpretation of these words would make no sense.   Thus, Officer Minter's failure to

2   specifically inform petitioner that his statements could be used "against" him does not invalidate

3   his confession.  See United States v. Noti, 731 F.2d 610, 614-15 (9th Cir. 1984) ("[i]f a defendant

4   has been told the substance of his constitutional rights, it is not fatal if irrelevant words or words

5   with no independent substance are omitted"); see also State v. Melvin, 65 N.J. 1, 319 A.2d 450,

6   456 (1974) (disapproving of warning that anything said could be used "for or against" the

7   defendant in any court proceeding but finding that such a warning nonetheless adequately

8   informed the defendant of the substance of his constitutional rights).

9          Petitioner next complains that the interrogating officer failed to inform him that he

10  had the right to an appointed attorney free of charge "during the questioning" or that "he had the

11  right to confer with an attorney **before** questioning, or that he had the right to the **appointment** of

12  an attorney to assist him before or during questioning, if he so desired." (Traverse at 44, 45.)

13  (emphasis in original).  In short, petitioner argues that he was not specifically informed that an

14  appointed attorney could be present before and during the interrogation.

15         The United States Supreme Court in Miranda stated that "an individual held for

16  interrogation must be clearly informed that he has the right to consult with a lawyer and to have

17  the lawyer with him during interrogation." 384 U.S. at 471.  The duty of guarding against an

18  invasion of these rights and determining the adequacy of warnings has been left to the lower

19  courts which are to give precedence to substance over form.  United States v. Lamia, 429 F.2d

20  373, 375-76 (2d Cir. 1970).[5]   In performing this function courts have concluded that "[r]eference

21  to the ability to procure appointed counsel at some unspecified future time, ... negates the

22  inference that the suspect had an immediate right to appointed counsel.'" Connell, 869 F.2d at

23  1352.  See also Prysock, 453 U.S. at 360 ("[o]ther courts considering the precise question

24  ────────────────

25         [5]  Thus, reviewing courts assume that a defendant makes the logical inference that
    appointed counsel is available during questioning when the defendant is separately advised of the
26  right to counsel before and during questioning and of the right to appointed counsel.  Connell,
    869 F.2d at 1351-52.

1   presented by this case--whether a criminal defendant was adequately informed of his right to the

2   presence of appointed counsel prior to and during interrogation--have not required a verbatim

3   recital of the words of the <u>Miranda</u> opinion but rather have examined the warnings given to

4   determine if the reference to the right to appointed counsel was linked with some future point in

5   time after the police interrogation"); <u>Duckworth v. Eagan</u>, 492 U.S. 195, 200-201 (1989)

6   (informing a suspect that an attorney would be appointed for him "if and when you go to court"

7   sufficient under <u>Miranda</u> where suspect also told he the right to a lawyer "before and during

8   questioning").  Likewise, courts have found that merely advising a defendant that he has a right to

9   an attorney and that one will be appointed if he cannot afford one is insufficient because it does

10  not convey to the defendant that he is entitled to have a lawyer present during the interrogation.

11  <u>United States v. Bland</u>, 908 F.2d 471, 473-74 (9th Cir. 1990); <u>Noti</u>, 731 F.2d at 614-16; <u>Montoya</u>

12  <u>v. United States</u>, 392 F. 2d 731, 734 (5th Cir. 1968); <u>Windsor v. United States</u>, 389 F. 2d 530, 533

13  (5th Cir. 1968); <u>see</u> <u>also</u> <u>People of Territory of Guam v. Snaer</u>, 758 F.2d 1341, 1343 (9th Cir.

14  1985) (statement on preprinted form that "[y]ou have a right to consult with a lawyer and to have

15  a lawyer present with you while you are being questioned" adequately conveys notice of the right

16  to consult with an attorney before questioning as well).

17          Here, petitioner was informed by Detective Minter that "before we can talk about

18  what happened, before even I can tell you what happened," she was going to advise him "of his

19  rights," including the "right to remain silent,"  "the right to talk to an attorney and to have an

20  attorney present" and that if petitioner could not afford an attorney, "one will be appointed, free of

21  charge, to represent you."  (Supp. CT at 253.)  The clear import of the officer's abbreviated choice

22  of words in this context, particularly the reference to the right to have an attorney "present," was

23  that petitioner had the right to an appointed attorney which began immediately and continued

24  throughout the interrogation without qualification.  The officer did not limit the right to counsel to

25  some point in the future or to any specific point at all (<u>see</u> <u>Connell</u>, 869 F.2d at 1352) but, rather,

26  informed petitioner that he had the unfettered right to have appointed counsel present.

1    This court is unpersuaded by petitioner's argument that the words spoken by the

2  officer were fatally ambiguous or that they would have caused a reasonable person to believe that

3  counsel would be provided only at some future date after the interrogation.  A far more reasonable

4  interpretation of the words spoken by Detective Minter is that petitioner had the right to consult

5  with and have appointed counsel present both before and during the questioning that was about to

6  take place.[6]  Accordingly,  in substance the informal advisement given in this case adequately

7  conveyed to petitioner his rights as required by <u>Miranda</u>.[7]

8    B.  <u>Whether Petitioner's Confession was Coerced in violation of the Fifth and Fourteenth</u>

9  <u>Amendments</u>

10    Petitioner's next claim is that his Fifth Amendment right against self-incrimination

11  and his Fourteenth Amendment right to due process were violated when the state obtained his

12  confession through the use of prohibited coercive interrogation techniques.  He claims that the

13  coercive methods used to interrogate him rendered his incriminating statements to police

14  investigators involuntary and, therefore, inadmissible at trial.

15    On appeal, petitioner argued that his incriminating statements to police were not

16  the product of his free will, but were induced and coerced by the following factors:

17
    In particular, he asserts that Detectives Garverick and Fancher
    "hammer[ed] accusatorily on [him]; caused him to believe that, if he
18    did not confess, he would be sentenced to life in prison where he
    could be physically beaten and raped; suggested that he was not
19    going to get a talented attorney, like "OJ's lawyers," who could get
    him off; stated they did not care if the victim was killed in a drug
20    deal – thus, in defendant's view, suggesting that nothing bad would

21  _____

22    [6]  The court notes that at no time before or during his interrogation did petitioner express
    any confusion about this fact.

23
    [7]  Of course, had Detective Minter read petitioner his <u>Miranda</u> rights from a card, none of
24  this discussion regarding the sufficiency of the warning would have been necessary.  As observed
    by one court almost twenty-five years ago, "[t]hose warnings are well-established and
25  mechanical in nature. Most ten year old children who are permitted to stay up late enough to
    watch police shows on television can probably recite them as well as any police officer.  There is
26  generally no question as to the sufficiency of the warnings themselves."  <u>United States v.</u>
    <u>McCrary</u>, 643 F.2d 323, 330, n.11 (5th Cir. 1981).

1  happen to him if he confessed; and implied that defendant could
   save himself from a life term if he confessed.

2

3  (Opinion at 5.)[8]

4        The California Court of Appeal did not decide whether petitioner's confession was

5  rendered involuntary by virtue of the officers' interrogation tactics.  Instead, it concluded that any

6  error in admitting the confession was harmless because petitioner's trial counsel used petitioner's

7  statements to the police to argue for and obtain a jury verdict of second degree murder, when the

8  facts strongly pointed to guilt of first degree felony murder.  (Id. at 6.)  Because defense counsel's

9  strategy in this regard was successful, the state appellate court concluded that there was no basis

10  upon which to find that petitioner was prejudiced by the introduction of his statements.  (Id.)  The

11  court explained its reasoning as follows:

12        Defendant began the interview by relating a completely false
       version of his evening activities.  As the interview progressed, he
13        learned what the detectives knew and what his companions were
       saying; and he altered his story accordingly.  His version of the
14        events went through numerous revisions.  In his final version, he
       claimed that he had gone to the schoolyard to trade his pistol for a
15        pound of marijuana.  Deragon had arranged the deal and was to
       receive half of the marijuana.  Defendant was willing to give
16        Deragon half of the marijuana because he only had two dollars and
       did not know anyone else who would trade marijuana for the gun.
17        When defendant met Deragon and the victim and brought out the
       gun, Deragon and/or the victim grabbed for it.  There was a three-
18        way struggle and the gun went off, striking the victim.  The victim
       ran at defendant, so defendant shot him again.  He then grabbed the
19        marijuana and ran to the car.

20        This final version of the events served as the evidentiary basis for
       the defense.  The parties' positions were reversed from those that
21        normally accompany the introduction of a defendant's extrajudicial
       statements.  The prosecutor spent a considerable portion of his
22        argument attempting to convince the jury that it should not give
       credence to defendant's statement.  On the other hand, defense
23        counsel based his entire argument on defendant's final version of

24  _____

25        [8]  It is true that during their interrogation Detectives Garverick and Francher several times
   urged petitioner to tell them everything he knew about the involvement of others in the crime,
26  suggesting to him that given his size and age he was likely to be raped in prison.  (See Supp. CT
   at 297-98, 304, 306 and 312.)

the events.  He told the jury that defendant was young and
frightened and disinclined to admit responsibility, but that the
detectives finally wore him down and he told them the truth.

Contrary to defendant's assertion on appeal, if portions of his
interview had been excluded, the prosecution would not have been
reduced to the extrajudicial statements of Bettencourt.[9]
In addition to the circumstances of his arrest, defendant was at the
schoolyard for a period of time before the murder, and he and his
car were observed by a number of individuals who resided in the
area.  Two of the neighbors identified defendant at trial, and others
described a person who could have been only him since none of the
other participants resemble defendant.

---

[9]

In an interview on the night of the crime, Bettencourt downplayed
his knowledge of the events and said he did not want to make
defendant look bad.  He admitted he was at the schoolyard and
drove defendant and his car away from the scene, but claimed he
thought defendant had gone there to sell some marijuana.  He
identified the murder weapon as defendant's gun and said that
defendant is usually armed, but claimed he did not know defendant
had his gun that night until after the crime.  He stated that, while
they were in the car after the shooting, defendant said something to
the effect that the victim grabbed for a gun so defendant shot him.

A few months after the crime, Bettencourt submitted to an
interview with the prosecutor under a promise of immunity.  On
this occasion, he said that defendant went to the schoolyard to rob
the victim, and that defendant and Deragon had planned it well in
advance.  Deragon was to lure the victim to the schoolyard on the
pretense of purchasing marijuana from him, and then defendant
would show up and pretend to rob Deragon along with the victim.
Before he went into the schoolyard, defendant said: "'I'm gonna
jack this little White boy and take the weed from him.'"  In the car
after the shooting, defendant said that the victim grabbed for the
gun and that he shot him by accident the first time, and then kept
shooting as the victim came at him.

At trial, Bettencourt retracted his earlier statement and claimed that
all defendant said before the shooting was that he was going to sell
a sack (marijuana).  Bettencourt admitted that he was fearful for
himself and his family, that he had come under pressure from
defendant's associates with respect to his anticipated testimony,
that defendant had called him from the jail and told him not to
testify, and that someone had shot at him, which he associated with
his anticipated testimony.  Nevertheless, he claimed he was telling
the truth at trial.

19

Most of the neighbors left the area when they saw what they regarded as suspicious activity, and it does not appear that anyone but the participants witnessed the actual crime.  However, two neighbors heard an argument followed by three shots, and numerous persons heard the three shots.  At the scene, the victim's keys and pager were out of his pockets and on the ground, and there was a trail of marijuana from where the victim's marijuana had spilled.

After the shots were heard, witnesses saw defendant run from the schoolyard to his car.  When defendant was detained a short time and distance later, he had a partially false wad of money and the victim's marijuana on his person, and the murder weapon was on the floor of the car where he was riding.  During the portion of his police interview which occurred prior to the challenged tactics, defendant obviously was trying to fabricate a story, thus evidencing a consciousness of guilt.

Hence, the testimony of the neighbors, together with other evidence, amply identified defendant as a primary perpetrator of the incident in which the victim was killed and his property was taken.  (See People v. Gardner (1969) 71 Cal.2d 843, 850.)  And, "when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery."  (People v. Turner (1990) 50 Cal.3d 668, 688.)

Consequently, without the final portions of defendant's interview, the evidence overwhelmingly established defendant's participation in the criminal endeavor in which the victim was killed.  Without the final portions of defendant's interview, the evidence presented a compelling case for first degree felony murder.  Without the final portions of defendant's interview, defense counsel would have been reduced to asking the jury to hypothesize, without any support in the evidence, the possibility of a less culpable scenario.

In contrast, with the final portion of defendant's interview, defense counsel was able to urge the jury to accept the possibility of a less culpable scenario than the evidence against defendant otherwise would suggest.  With the final portion of defendant's interview, the jury returned a verdict of second degree murder on evidence which otherwise would compellingly support a finding of first degree murder.

Where the evidence relevant to a determination to exclude a statement is in the record and uncontroverted, and the use of the defendant's extrajudicial statements was prejudicial, the special policy considerations that preclude the use of involuntary statements will support appellate review despite a defense failure to make a sufficient and timely objection in the trial court.  (See People v. Underwood (1964) 61 Cal.2d 113, 126.)  But here, reliance upon the

/////

1        final portions of defendant's interrogation constituted the defense
strategy, and the defense argument would have been without any
2        evidentiary support absent defendant's extrajudicial statements.

3  (Opinion at 6-10.)

4        Where an involuntary confession is improperly admitted at trial, a reviewing court

5  must apply a harmless error analysis, assessing the error "in the context of other evidence

6  presented in order to determine whether its admission was harmless beyond a reasonable doubt."

7  Fulminante, 499 U.S. at 308.  In the context of habeas review, the standard is whether the error

8  had substantial and injurious effect or influence in determining the jury's verdict.  See Brecht v.

9  Abrahamson, 507 U.S. 619, 637 (1993); Beaty v. Steward, 303 F.3d 975, 994 (9th Cir. 2002);

10  Henry v. Kernan, 197 F.3d 1021, 1029 (1999).  The analysis must be conducted with an

11  awareness that "a confession is like no other evidence," and that "a full confession may have a

12  'profound impact' on the jury."  Fulminante, 499 U.S. at 296.  See also Henry, 197 F.3d at 1029-

13  30.[10]

14        The decision of the state appellate court that petitioner was not prejudiced by the

15  admission at trial of his statements to police is not contrary to or an unreasonable application of

16  Fulminante and Brecht and should not be set aside.  As explained by the state court, this case

17

---

18        [10]  The Fourteenth Amendment to the United States Constitution demands that
confessions be made voluntarily.  See Lego v. Twomey, 404 U.S. 477, 483-85 (1972).  A
19  confession is voluntary only if it is "'the product of a rational intellect and a free will.'"
Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989) (quoting Townsend v. Sain, 372 U.S.
20  293, 307 (1963)).  See also Blackburn v. Alabama, 361 U.S. 199, 208 (1960).  "The line of
distinction is that at which governing self-direction is lost and compulsion, of whatever nature or
21  however infused, propels or helps to propel the confession."  Collazo v. Estelle, 940 F.2d 411,
416 (9th Cir. 1991) (en banc) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)).  A
22  "totality of the circumstances" test applies in determining whether the will of an accused was
"overborne."  Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). If a statement was not the
23  product of a rational intellect and a free will, a conviction arising from the use of the statement
cannot stand.  See Mincey v. Arizona, 437 U.S. at 398 (citing Townsend v. Sain, 372 U.S. 293,
24  307 (1963), and Blackburn v. Alabama, 361 U.S. 199, 208 (1960)).  The transcript of
petitioner's interrogation contains nothing that would indicate his will was "overborne." And, as
25  explained above, this court concludes that petitioner understood his rights set out in the Miranda
warnings and the potential consequences of a decision to relinquish them.
26

1    presents the unusual situation in which petitioner's statements to police provided the foundation

2    of his defense theory, as opposed to the typical situation where a confession is used against the

3    defendant.   Under these circumstances, the admission of petitioner's confession was actually

4    beneficial to the defense against the first degree murder charge.   In addition, as described by the

5    California Court of Appeal, evidence independent of petitioner's confession overwhelmingly

6    established petitioner's involvement in the robbery and murder of the victim.   Accordingly,

7    petitioner's confession was largely superfluous to other evidence of petitioner's guilt.   While

8    petitioner's confession may be said to have had a "substantial" effect on the jury's verdict, it did

9    not have an "injurious" effect.   Accordingly, petitioner is not entitled to relief on this claim.

10            For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

11   application for a writ of habeas corpus be denied.

12            These findings and recommendations are submitted to the United States District

13   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).   Within twenty

14   days after being served with these findings and recommendations, any party may file written

15   objections with the court and serve a copy on all parties.   Such a document should be captioned

16   "Objections to Magistrate Judge's Findings and Recommendations."   Any reply to the objections

17   shall be served and filed within ten days after service of the objections.   The parties are advised

18   that failure to file objections within the specified time may waive the right to appeal the District

19   Court's order.   Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20   DATED: August 29, 2005.

21

22                                                   DALE A. DROZD
                                                     UNITED STATES MAGISTRATE JUDGE
23

24   DAD:8:garcia891.hc2

25

26